## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

| | | |
|---|---|---|
| **CHARLES W. SIMS, JR.** | : | |
| 30178 Cochise Court | : | |
| Mechanicsville, MD  20659 | : | |
| | : | |
| Plaintiff, | : | **Civil Action No.:** |
| | : | (Jury Trial Demanded) |
| v. | : | |
| | : | |
| **EXELON GENERATION COMPANY,** | : | |
| **LLC, D/B/A CALVERT CLIFFS** | **:** | |
| **NUCLEAR POWER PLANT** | : | |
| 300 Exelon Way | : | |
| Kennett Square, PA  19348 | : | |
| | : | |
| Serve:  Resident Agent | : | |
|        Corporate Creations Network, Inc. | : | |
|        #700 | : | |
|        2 Wisconsin Circle | : | |
|        Chevy Chase, MD  20815 | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

**COMES NOW**, Charles W. Sims, Jr., ("Mr. Sims" or "Plaintiff"), by and through his

undersigned counsel, and hereby brings this Complaint against Exelon Generation Company,

LLC., d/b/a Calvert Cliffs Nuclear Power Plant ("Exelon" and "Defendant") by averring and

asserting as follows:

## INTRODUCTION

1.      This is an action brought pursuant to Maryland's anti-discrimination statute, MD.

CODE ANN., STATE GOV'T § 20-606 ("Title 20") and the Age Discrimination in Employment

Act of 1967, 29 U.S.C. § 633a, *et seq.*, as amended, ("ADEA"), addressing age discrimination

and retaliation in the terms, conditions and discharge of employment.

1

2.     In addition, this action involves a claim for tortious interference arising under Maryland common law.

3.     These claims, supporting facts and damages set forth in this action are referred to individually or, at times, collectively as the "Lawsuit."

## THE PARTIES

4.     Mr. Sims is a 61 year-old adult male resident of the State of Maryland who was an "employee" of Defendant within the meaning of Title 20 and the ADEA.

5.     Defendant Exelon is a foreign corporation registered to do business in the State of Maryland with a listed principal place of business at 300 Exelon Way, Kennett Square, Pennsylvania 19348.  Exelon is a Fortune 100 energy company and the largest operator of nuclear power plants within the United States.

6.     Exelon maintains a business unit known as Exelon Nuclear, which operates more than a dozen nuclear power plants throughout the United States, including the Calvert Cliffs Nuclear Power Plant located at 1650 Calvert Cliffs Parkway, Lusby, Maryland  20657.

7.     Exelon was an "employer" within the meaning of Title 20 and the ADEA.  All actors and individuals identified in this Lawsuit were employees of Exelon acting within the scope and course of their employment and authority

## JURISDICTION AND VENUE

8.     Jurisdiction of this matter arises under 28 U.S.C. § 1331 with a federal question involving the ADEA.   In addition, the Title 20 Maryland statutory claims set forth herein are intertwined and related to the federal question, forming part of the same case and controversy, and vesting this Court with supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in the United States District Court for the District of Maryland under 28 U.S.C. § 1391(b) as the employment practices alleged to be unlawful were committed at the Calvert Cliffs Nuclear Power Plant in Calvert County, where Mr. Sims was employed.

## ADMINISTRATIVE UNDERTAKINGS

10.     On or about February 19, 2019, Mr. Sims timely contacted the Baltimore Field Office of the Equal Employment Opportunity Commissions ("EEOC") to initiate the intake process concerning recurring discrimination and harassment on the bases of his age and retaliation.

11.     Thereafter, with the assistance of the EEOC, Mr. Sims filed a formal charge of discrimination with the EEOC on or about May 7, 2019.   The charge was dually filed with the Maryland Commission on Civil Rights ("MCCR").

12.     On or about July 30, 2019, the EEOC assigned the charge to MCCR for investigation pursuant to a work-sharing agreement between the agencies.

13.     On or about December 4, 2019, Mr. Sims filed an Amended Charge with the MCCR and dually filed with the EEOC.  The Amended Charge served to clarify the nature of the initial charge and set forth additional detail concerning the invidious and illegal discrimination, hostile work environment and retaliation in the terms, conditions, and discharge of Mr. Sims' employment.

14.     The present Lawsuit is being initiated timely and after the passing of 180 days following the institution of administrative proceedings, and is being initiated within two years of certain acts, events and omissions giving rise to these claims as required by Title 20.

15.     All conditions precedent necessary to file the claims contained in this Lawsuit have been satisfied.

**FACTS**
Hiring and Performance

16.     Mr. Sims is a former career employee of Exelon, who worked at the Calvert Cliffs Nuclear Power Plant (the "Calvert Cliffs Plant") for more than twenty-seven years.

17.     Mr. Sims was first hired in October 1991 when the Calvert Cliffs Plant was owned and operated by Baltimore Gas & Electric Co. Calvert Cliffs Plant was then purchased by Constellation Energy Group, Inc. ("Constellation") which owned it until Exelon purchased the plant. During his employment, Mr. Sims held several positions, the most recent of which was as an EMD Nuclear Electrical Technician.

18.     During his employment, Mr. Sims received exemplary performance reviews, and was promoted to the highest levels and reached the maximum pay grades of his positions. At all times, Mr. Sims exceeded the legitimate performance expectations of his employer. Prior to the events leading to this Lawsuit, Mr. Sims had no disciplinary issues of any kind for nearly three decades.

Industry Consolidation

19.     In or around 2012, Exelon acquired Constellation in a move that required a slew of regulatory approvals and took years to implement. Subsequently, Exelon acquired Pepco Holdings, Inc. ("Pepco"), which made Exelon the largest power distributor in the United States oft described as the "Nuclear Giant."

20.     In the past few years, Exelon has made the workplace difficult for many older employees. This fostered an environment in which the longest tenured and oldest employees such as Mr. Sims were often subjected to disparate treatment and targeted for removal.

Harassing, Discriminatory Treatment

21.     Since at least 2018, Mr. Sims was subjected to continual mistreatment due to his age, in stark contrast to the treatment afforded similarly younger technicians.

22.     Mr. Sims was regularly mocked about his age, including remarks about him being an "old man."  He was subjected to unwarranted negative comments about his work and workplace scrutiny.

23.     On numerous occasions throughout 2018 and early 2019, Mr. Sims was deliberately micromanaged, berated and singled out for criticism, faulted where no wrongdoing occurred and was blamed for errors of others.  During this same period, his supervisors ignored his concerns about serious safety issues, denied him extra work opportunities, denied travel expenses, and ordered him to falsify time sheets under threat of punishment.

24.     In March and April of 2018, Mr. Sims spent four weeks out-of-state on assignment to the Exelon Limerick Nuclear Generating Station ("Limerick Plant") in Pottstown, Pennsylvania to support Exelon during a refueling outage at the Limerick Plant.

25.     Mr. Sims returned from the refueling outage assignment to the Calvert Cliffs Plant on April 23, 2018.

26.     On this same day, the Exelon Nine Mile Point Nuclear Generating Station ("Nine Mile Plant") located in Oswego, New York began scheduled refueling outages and put out a request for help to management at the Calvert Cliffs Plant.

27.     Mr. Sim's EMD Supervisor, Robert Marino ("Mr. Marino"), promptly asked all qualified technicians at the Calvert Cliffs Plant if they would be willing to volunteer to leave for Oswego, New York, the following morning to an assignment at the Nine Mile Plant.

28.     Mr. Sims was the only technician who indicated a willingness to support Exelon and go on another out-of-state assignment on short notice.

29.     However, initially, Mr. Sims notified Mr. Marino that one issue preventing him from accepting the assignment was that his daughter was getting married on May 5, 2018.

30.     In practical terms, to attend the wedding Mr. Sims would have to miss work and spend all day traveling on the days immediately before and after the wedding, which would result in a loss of two days of earnings.

31.     To address this issue and induce Mr. Sims to accept the assignment at the Nine Mile Plant, Mr. Marino indicated that Mr. Sims would be paid for his travel days and expenses to attend the wedding in Maryland.  Mr. Marino informed Mr. Sims it was approved by Exelon.

32.     Approximately two weeks later Mr. Sims attended his daughter's wedding and used the "work" pay code on his time sheets for his travel days as previously instructed by Mr. Marino.

33.     Upon information and belief, a similarly situated and younger technician named Kyle Wells ("Mr. Wells") had an important event to attend and Exelon paid him for his time returning home and to his assigned plant.

34.     Despite Mr. Marino's promises, he later approached Mr. Sims and said he "changed his mind" and that Mr. Sims would not be compensated for his travel days, which cost Mr. Sims almost $2,000 dollars in lost wages.

35.     Mr. Sims was justifiably upset and angry about this turn of events, and complained to Mr. Marino that Exelon was going back on its promise.  Mr. Marino became enraged and ordered Mr. Sims into his office.  At that point, Mr. Marino unleashed a torrent of abusive language at Mr. Sims, hollering and gesticulating aggressively.  Mr. Marino peppered his tirade with a multitude of "f*ck yous" and yelled that Mr. Sims will do "what the "f*ck" I tell you;" that "he didn't give a sh*t" what company policy stated; that he had changed his mind

about the pre-departure agreement and was not going to allow Mr. Sims to be paid for the two travel days, expenses or per-diem; that he would no longer approve Mr. Sims for any double time; and that he would "change [his] time and work hours to whatever the f*ck I want;" among other outrageous proclamations.

36.    Mr. Marino also ordered Mr. Sims to change his timesheets for those days, to which Mr. Sims reminded Mr. Marino that by doing that Mr. Sims would be falsifying his records. Mr. Marino continued with his tirade and ordered Mr. Sims to change his time sheets, threatening him if refused to do so.

37.    As Mr. Sims was walking out of the office, he informed Mr. Marino that he would be filing an ethics complaint on the Exelon Ethics Hotline ("Hotline") concerning Mr. Marino's outburst and mistreatment.   Mr. Sims filed the ethics that same day.

38.    Mr. Marino was apprised of the ethics complaint on the same day.  Mr. Marino told Mr. Sims that the EMD supervisor and Mr. Marino's supervisor, Cosmo Valente ("Mr. Valente") was influencing him to act this way towards Mr. Sims and that Mr. Valente did not like Mr. Sims.

Removal from RFO Eligibility

39.    In the summer of each year, the Calvert Cliffs Plant posts a list of all qualified technicians who are available to volunteer for assignment to other Exelon nuclear generating stations when there are scheduled refueling outages.  These are referred to as RFO fleet requests.

40.    Even though out-of-state RFO assignments can last for weeks or months and can take a technician away from his or her home and family, they are more lucrative in terms of pay and, as such, are highly sought after.  It is not unusual for an RFO fleet assignment to increase a technician's pay more than $10,000 dollars during the assignment period.

41.     During the week of June 11, 2018, a list of all eligible RFO technicians was posted for the fall.

42.     Despite the fact that Mr. Sims had been an eligible for RFO fleet assignments for many years, his name was absent from this list.

43.     Mr. Sims approached Mr. Marino and asked if his removal from the eligibility list was in any way related to their discussions in May, just a few weeks earlier.  Mr. Marino gruffly responded "YES."

Internal Complaint

44.     On or about June 14, 2018, Mr. Sims again submitted a complaint on the Hotline. His ethics complaint was assigned a report number "EXC-18-0600033."

45.     In his initial and follow-up submissions through the Hotline and in discussions with Exelon human resource personnel, Mr. Sims repeatedly complained and reported what he believed were "continuing retaliatory actions," "ongoing retaliation and harassment," "retaliation antics and harassment," and that "everything seems to be focused on age discrimination with the corporate focus on reducing staffing and retaliation."

46.     Mr. Sims' submissions and discussions were protected activity, and placed Exelon on notice of discrimination, harassment and retaliation.

47.     Throughout the summer and early fall of 2018, Mr. Sims continued to have ongoing meetings with Exelon's human resources personnel in regards to his complaints.

48.     Mr. Sims was repeatedly told that "we will handle this" but no specifics were ever offered as to what findings, conclusions or remedial curative action was taken under the circumstances, if any.

Ongoing Discrimination and Retaliation

8

49.     Mr. Sims was assured by Exelon's human resources personnel,  "we will handle this."  However, the ongoing campaign of discrimination and retaliation continued unabated.

50.     For example, in July of 2018, just weeks after submitting a complaint through the Hotline, Mr. Marino further retaliated against Mr. Sims by forcing him to refund certain pay that he had received while assigned to the Nine Mile Plant in April.

51.     By way of background, technicians on RFO assignments are entitled to an updated rate of pay for leading or addressing certain complex tasks.  At the time, both Mr. Sims and a younger similarly situated technician named Frank Koller ("Mr. Koller") received the upgraded rate of pay for their work at the Nine Mile Plant.

52.     Despite having earned this upgraded rate of pay, Mr. Marino forced Mr. Sims to return the value of his upgraded rate of pay while allowing Mr. Koller to retain his.

53.     In August of 2018, Mr. Sims had a meeting with human resources regarding his travel pay issues at the Nine Mile Plant months earlier in April.  During this meeting, the human resources manager, Seth Beardsley ("Mr. Beardsley") stated that while he agreed with Mr. Sims, he could not take curative action unless Mr. Marino admitted to lying about payment for the travel days.

54.     Exelon's human resources personnel focused on the issue of non-payment of travel days, but made no attempt to investigate or address Mr. Sims accusations that these and other actions were age-based harassment, discrimination and retaliation Mr. Sims suffered with on a near daily basis.

55.     Emboldened by Exelon's failure to address these issues, Mr. Marino continued to engage in harassment and retaliation, such as creating several false negative entries in Exelon's "ePeople" system, the company's personnel file repository, regarding Mr. Sims attendance.

9

56. By the fall of 2018, it was becoming increasingly evident that Mr. Sims was being targeted for discipline and removal from Exelon.

57. In November of 2018, a Calvert Cliffs Plant manager named Ken Price ("Mr. Price") performed a so-called "inspection" of all the technician's work areas, including several younger technicians. This type of inspection was very unusual and Mr. Sims suspected it was triggered as a means to harass and target Mr. Sims.

58. During this inspection, Mr. Price entered Mr. Sims' personal workspace and removed Mr. Sims' calendar from his desk. The calendar was a humorous depiction of women wearing nuclear power plant safety apparel. The depictions of women in the calendar were not inappropriate or sexual in any way, and contained no nudity or manifestations of sexual acts of any kind. Instead, the calendar was in jest and was styled "Safe Working Attire."

59. Thereafter, Mr. Sims was called into human resources and questioned about the calendar. Human resources admitted the calendar did not violate their policies and was not offensive in any way. Notwithstanding, Exelon proceeded to admonish Mr. Sims for having material that could be considered offensive by someone.

60. Tiffany Curry ("Ms. Curry"), a Senior HR Generalist for Exelon, authorized Mr. Price to place a negative and adverse entry in the ePeople system regarding Ms. Sims, which stated that he needed to "maintain a respectful work place that is harassment free," even though the calendar not offensive by any reasonable person standard.

61. Upon information and belief, the work area inspections revealed that several of Mr. Sims co-workers had materials including photos, cartoons, and hand drawn images containing sexually suggestive depictions of women that were much more provocative than the banal calendar Mr. Sims had in his workplace. None of these individuals was admonished or had

adverse entries placed in the ePeople system.  Instead, only Mr. Sims was singled out in this fashion.

Removal of Security Access

62.     In early 2019, Aaron Coons ("Mr. Coons") was installed as a new supervisor at the Calvert Cliffs Plant.

63.     In or around January of 2019, it was announced that the Calvert Cliffs Plant was transitioning from a paper-based to an electronic work process ("EWP") software system in an attempt to reduce the amount of paper used at the facility.

64.     Mr. Sims had no experience in the new software system.  He had spent decades successfully operating in a paper-based environment.  Mr. Sims also did not grow up in the electronic work frontier in general, thus further the underscoring the need for effective training.

65.     The Calvert Cliffs Plant purported to host a training session for technicians to learn the new EWP systems but there was no working server at the time of the training.  This resulted in Mr. Sims having no opportunity for hands-on learning and he received no actual practice with computers in the use of the new software system.

66.     The training presenters acknowledged this issue, but pressed on with a theoretical discussion of what to expect when the EWP software system was used.

67.     Mr. Sims provided feedback to his immediate EMD supervisor Joe Wiggins ("Mr. Wiggins"), stating that the three-hour training session was not helpful because the training instructors could not maintain the server in a working manner during the training and the training ended up being nothing more than a discussion of what to expect.  Mr. Wiggins' response to Mr. Sims was "that s*cks, we will just have to learn the new process as we go along."

11

68.     When using the new EWP system, technicians, including Mr. Sims were required to use an Apple Ipad.   To do so, the technicians would checkout the Apple iPad and when finished with the task, they would return the Apple iPad.

69.     On or about January 23, 2019, Mr. Coons approached Mr. Sims and informed him that he had failed to "sign out" of the EWP system the last time he used the Apple Ipad.  At the time, Mr. Sims had only used the EWP system approximately three times and was still learning to use the software as he went along.

70.     Mr. Coons accused Mr. Sims of removing a circle on the EWP software work task step.  Mr. Sims denied removing the circle because he had not erased or modified any information on the EWP system.  What Mr. Sims had done was to check a step as "not applicable" because, in fact, it was not applicable.  Mr. Sims would not know how to erase or modify this circle because he was still learning the basics of how to use the EWP software.

71.     Mr. Coons and the Human Resources department at Exelon created an issue where there was none.  Even if Mr. Sims had inadvertently failed to sign out because he was still learning the new system, it would not be grounds for serious discipline and as to the removed "circle," Mr. Sims would not know how to do this.

72.     On February 18, 2019, Mr. Price telephoned Mr. Sims and instructed him not to come to work because his security access had been revoked due to allegedly falsifying documents by removing a circle with "N/A" on the EWP system.

73.     Fully understanding that this was Exelon's concocted reason to terminate him, he contacted the Baltimore Field Office of the EEOC on February 19, 2019 to submit a complaint and set up an intake date.

74.    Mr. Sims then filed another complaint via the Hotline, wherein he again complained of age discrimination and retaliation.  After filing the Hotline complaint, Mr. Sims was summoned by Human Resources and questioned by Ms. Curry.  During that questioning, Mr. Sims revisited with Ms. Curry that he was referred to as the "old guy" by supervisors and treated differently than the younger technicians in work assignments, time off requests, and general treatment.  Ms. Curry stated she would look into it but qualified her response by stating she did not believe it was age discrimination.

Termination and Appeal

75.    Mr. Sims was terminated on February 26, 2019, by telephone.

76.    No reason was given for Mr. Sims' termination, and the subsequent letter of discharge from Ms. Curry noted that Mr. Sims had been discharged for "violating Exelon's Employee Standards of Conduct."  Mr. Sims' did not violate Exelon's Employee Standards of Conduct and if the lack of training resulted in Mr. Sims not having signed out effectively, it was unintentional and should not have caused him to be terminated.  Two of Mr. Sims' co-workers accessed pornography on company computers, a serious transgression, and though they were initially terminated, they were rehired shortly thereafter.  Moreover, these two employees were not blackballed from the industry and remain employed with Exelon.

77.    Upon information and belief, Exelon later represented to the Maryland Department of Labor, Licensing and Regulation ("DLLR") in connection with request for unemployment that Mr. Sims was discharged for failing to follow instructions.

78.    On or about March 12, 2019, through Exelon's internal process, Mr. Sims appealed the discharge and removal of access decisions by Exelon.

13

79. Unfortunately, the submission of an appeal letter did not alter Exelon's actions, and Mr. Sims was forced to endure the humiliating loss of an exemplary 28-year career.

### Further Acts of Career Reprisal

80. Exelon's ongoing pattern of retaliation against Mr. Sims did not stop with his termination from the Calvert Cliffs Plant.

81. Following the termination from Exelon, Mr. Sims in a good faith attempted to mitigate his damages. He applied for several positions, including a position with Dominion Virginia Power ("Dominion") as a nuclear technician for both the North Anna and Surry Nuclear Power Plants ("North Anna/Surry Plants") located in Louisa County, Virginia.

82. The North Anna/Surry Plants were two of the few nuclear generating stations within the entire mid-Atlantic footprint not owned or operated by Exelon or its affiliates, which meant that Mr. Sims had few employment options near his home.

83. The North Anna/Surry Plants are located several hours from Mr. Sims' home in Maryland. Mr. Sims was willing to work far from his home and family to attempt to mitigate the damages he has suffered.

84. Mr. Sims successfully completed his pre-access paperwork for security clearance, was hired by Dominion as a technician and was scheduled to begin work on March 11, 2020 at the North Anna Plant.

85. When Mr. Sims arrived for in processing at the security office of the North Anna Plant, he was informed that a "red-flag" was associated with his social security number, which had been placed on his record by Exelon.

14

86. The Security Office at the North Anna Plant contacted the Security Office at the Calvert Cliffs Plant and was informed that Exelon had placed a three-year suspension on Mr. Sims' clearance as a nuclear technician.

87. As a direct result of Exelon's actions, Mr. Sims' security access to the North Anna Plant was denied and his employment at Dominion revoked.

88. The position at Dominion presented an excellent opportunity for Mr. Sims to continue in his career and offered him the ability to be part of a team of technicians with assignments that were expected to last for many years.

89. Exelon's actions were invidious, malicious and intended to destroy what remained of Mr. Sims career.  At the age of 61, Mr. Sims is now jobless and blackballed within the entire nuclear industry with no meaningful employment prospects of any kind.

## COUNT ONE
## HOSTILE WORK ENVIRONMENT DUE TO AGE IN VIOLATION OF TITLE 20

90. Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

91. Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of MD CODE ANN., STATE GOV'T §20-602, *et seq.* ("Title 20").

92. As described in this Lawsuit, the discriminatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his age are in violation of Title 20.

93. During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees: (a) have engaged in unlawful employment practices against Mr. Sims on the basis of his age; and (b) have regularly and continually mistreated him due to his

age, creating a hostile work environment and affecting the terms and conditions of his employment on the basis of his age.

94. Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims. Mr. Sims has suffered extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A. Back pay and front pay;

B. Compensatory damages;

C. Attorneys' fees and costs;

D. Injunctive relief;

E. Punitive damages;

F. Pre and Post-Judgment interest.

G. Attorney fees and costs; and

H. Such other relief as the nature of his causes may permit.

## COUNT TWO
## DISCRIMINATION DUE TO AGE IN VIOLATION OF TITLE 20

95. Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

96. Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of Title 20.

97.     As described in this Lawsuit, the discriminatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his age are in violation of Title 20.

98.     During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims on the basis of his age by denying Mr. Sims hours of work, failing to pay him as promised, seeking repayment of wages earned, not providing him with shift opportunities, disparaging his reputation, causing him to incur expenditures not recouped, making it impossible for him to find new work and blackballing him in his industry, all of which has resulted in less remuneration and loss of money.

99.     Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims has suffered extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.     Back pay and front pay;

B.     Compensatory damages;

C.     Attorneys' fees and costs;

D.     Injunctive relief;

E.     Punitive damages;

F.     Pre and Post-Judgment interest.

G.     Attorney fees and costs; and

H.      Such other relief as the nature of his causes may permit.

## COUNT THREE
## WRONGFUL TERMINATION DUE TO AGE IN VIOLATION OF TITLE 20

100.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

101.  Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of Title 20.

102.    As described in this Lawsuit, the discriminatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his age are in violation of Title 20.

103.    During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims on the basis of his age by terminating him due to his age.

104.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims has suffered extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.      Back pay and front pay;

B.      Compensatory damages;

C.      Attorneys' fees and costs;

D.      Injunctive relief;

E.      Punitive damages;

18

F.      Pre and Post-Judgment interest.

G.      Attorney fees and costs; and

H.      Such other relief as the nature of his causes may permit.

## COUNT FOUR
## HOSTILE WORK ENVIRONMENT DUE TO RETALIATION
## IN VIOLATION OF TITLE 20

105.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

106.    Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of Title 20.

107.    During all times specified in the Complaint that are relevant to this Lawsuit, Mr. Sims repeatedly engaged in protected activity by opposing, complaining and raising the illegal and discriminatory practices directly to his supervisor, Human Resources and the EEOC and the Maryland Commission of Civil Rights.

108.    As described in this Lawsuit, the retaliatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his prior protected activity are in violation of Title 20.

109.    During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees: (a) have engaged in unlawful employment practices against Mr. Sims due to his prior protected activity; and (b) have regularly and continually mistreated him due Mr. Sims' internal and external complaints of age discrimination, creating a hostile work environment that affected terms and conditions of his employment.

110.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims'

19

rights and with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims has suffered

extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following

relief:

A.    Back pay and front pay;

B.    Compensatory damages;

C.    Attorneys' fees and costs;

D.    Injunctive relief;

E.    Punitive damages;

F.    Pre and Post-Judgment interest.

G.    Attorney fees and costs; and

H.    Such other relief as the nature of his causes may permit.

## COUNT FIVE
## WRONGFUL TERMINATION DUE TO RETALIATION
## IN VIOLATION OF TITLE 20

111.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the

Complaint as if more fully set forth herein.

112.  Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of

Title 20.

113.    As described in this Lawsuit, the retaliatory treatment of Mr. Sims in the terms,

conditions, benefits and discharge of his employment because of his prior protected activity are

in violation of Title 20.

20

114.    During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims in retaliation for his prior protected activity by terminating him.

115.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims has suffered extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

    A.    Back pay and front pay;

    B.    Compensatory damages;

    C.    Attorneys' fees and costs;

    D.    Injunctive relief;

    E.    Punitive damages;

    F.    Pre and Post-Judgment interest.

    G.    Attorney fees and costs; and

    H.    Such other relief as the nature of his causes may permit.

## COUNT SIX
## RETALIATION

116.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

117.    Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of Title 20.

21

118. As described in this Lawsuit, the retaliatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of retaliation are in violation of Title 20.

119. During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims in retaliation for his prior protected activity by denying Mr. Sims hours of work, failing to pay him as promised, seeking repayment of wages earned, not providing him with shift opportunities, disparaging his reputation, causing him to incur expenditures not recouped, making it impossible for him to find new work and blackballing him in his industry, all of which has resulted in less remuneration and loss of money.

120. Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims. Mr. Sims has experienced extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

      A.     Back pay and front pay;

      B.     Compensatory damages;

      C.     Attorneys' fees and costs;

      D.     Injunctive relief;

      E.     Punitive damages;

      F.     Pre and Post-Judgment interest.

      G.     Attorney fees and costs; and

H.      Such other relief as the nature of his causes may permit.

## COUNT SEVEN
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
## (MARYLAND COMMON LAW)

121.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

122.    Exelon, its agents and employees, knew that Mr. Sims would need to mitigate his damages and seek to resume his career as a nuclear technician within the industry and that putting a three-year mark on his clearance would make it impossible for him to be employed in the industry.

123.    The actions of Exelon, its agents, and employees as described in this Lawsuit, constitute tortious interference with existing prospective business relationships and/or expectations, and were done with malice.

124.    The actions of Exelon, its agents, and employees were intentional and willful acts that caused Mr. Sims not to be able to obtain employment.

125.    As a direct and proximate result of said conduct, Mr. Sims has suffered and will continue to suffer substantial damages.

126.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights or with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims has experienced extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.      Compensatory damages;

B.      Punitive damages; and

C.      Pre and Post-Judgment interest.

<b><u>COUNT EIGHT</u><br><u>HOSTILE WORK ENVIRONMENT DUE TO DISCRIMINATION<br>IN VIOLATION OF THE ADEA</u></b>

127.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

128.    At all times relevant to this Complaint, Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of the ADEA.

129.    As described in this Lawsuit, the discriminatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his age are in violation of the ADEA.

130.    During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees: (a) have engaged in unlawful employment practices against Mr. Sims on the basis of his age; and (b) have regularly and continually mistreated him due to his age, creating a hostile work environment and affecting the terms and conditions of his employment on the basis of his age.

131.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights or with deliberate indifference to the protected rights of Mr. Sims. Mr. Sims has experienced extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.      Back pay and front pay;

24

      B.       Liquidated damages;

      C.       Attorneys' fees and costs;

      D.       Pre and Post-Judgment interest;

      E.       Injunctive relief; and

      F.       Such other relief as the nature of his causes may permit.

**COUNT NINE**
**DISCRIMINATION IN VIOLATION OF THE ADEA**

132.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

133.    At all times relevant to this Complaint, Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of the ADEA.

134.    During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims on the basis of his age by denying Mr. Sims hours of work, failing to pay him as promised, seeking repayment of wages earned, not providing him with shift opportunities, disparaging his reputation, causing him to incur expenditures not recouped, making it impossible for him to find new work and blackballing him in his industry, all of which has resulted in less remuneration and loss of money.

135.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless regard for Mr. Sims' rights or with deliberate indifference to the protected rights of Mr. Sims. Mr. Sims has suffered extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.   Back pay and front pay;

B.   Liquidated damages;

C.   Attorneys' fees and costs;

D.   Pre and Post-Judgment interest;

E.   Injunctive relief; and

F.   Such other relief as the nature of his causes may permit.

## COUNT TEN
## WRONGFUL TERMINATION DUE TO AGE IN VIOLATION OF THE ADEA

136.   Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

137.  Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of the ADEA.

138.   As described in this Lawsuit, the discriminatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his age are in violation of the ADEA.

139.   During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims on the basis of his age by terminating him due to his age.

140.   Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims has suffered extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.    Back pay and front pay;

B.    Liquidated damages;

C.    Attorneys' fees and costs;

D.    Injunctive relief;

E.    Pre and Post-Judgment interest.

F.    Attorney fees and costs; and

G.    Such other relief as the nature of his causes may permit.

## COUNT ELEVEN
## HOSTILE WORK ENVIRONMENT DUE TO RETALIATION
## IN VIOLATION OF THE ADEA

141.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

142.    Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of the ADEA.

143.    During all times specified in the Complaint that are relevant to this Lawsuit, Mr. Sims repeatedly engaged in protected activity by opposing, complaining and raising the illegal and discriminatory practices directly to his supervisor, Human Resources and the EEOC and the Maryland Commission of Civil Rights.

144.    As described in this Lawsuit, the retaliatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his prior protected activity are in violation of ADEA.

145.    During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees: (a) have engaged in unlawful employment practices against Mr. Sims due to his prior protected activity; and (b) have regularly and continually mistreated him

27

due Mr. Sims' internal and external complaints of age discrimination creating a hostile work environment that affected terms and conditions of his employment.

146.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims has experienced extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

        A.    Back pay and front pay;

        B.    Liquidated damages;

        C.    Attorneys' fees and costs;

        D.    Injunctive relief;

        E.    Pre and Post-Judgment interest.

        F.    Attorney fees and costs; and

        G.    Such other relief as the nature of his causes may permit.

## COUNT TWELVE
## RETALIATION IN VIOLATION OF THE ADEA

147.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

148.    Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of the ADEA.

149.    As described in this Lawsuit, the retaliatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of retaliation are in violation of the ADEA.

28

150.    During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims in retaliation for his prior protected activity by denying Mr. Sims hours of work, failing to pay him as promised, seeking repayment of wages earned, not providing him with shift opportunities, disparaging his reputation, causing him to incur expenditures not recouped, making it impossible for him to find new work and blackballing him in his industry, all of which has resulted in less remuneration and loss of money.

151.    Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims. Mr. Sims experienced extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.    Back pay and front pay;

B.    Liquidated damages;

C.    Attorneys' fees and costs;

D.    Injunctive relief;

E.    Pre and Post-Judgment interest.

F.    Attorney fees and costs; and

G.    Such other relief as the nature of his causes may permit.

**COUNT THIRTEEN**
**RETALIATION WRONGFUL TERMINATION IN VIOLATION OF THE ADEA**

152.    Mr. Sims incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

29

153.   Mr. Sims was an "employee" and Exelon was an "employer" within the meaning of the ADEA.

154.   As described in this Lawsuit, the discriminatory treatment of Mr. Sims in the terms, conditions, benefits and discharge of his employment because of his prior protected activity are in violation of the ADEA.

155.   During all times as set forth in the Complaint and relevant to the Lawsuit, Exelon and its agents and employees have engaged in unlawful employment practices against Mr. Sims in retaliation for his prior protected activity by terminating him.

156.   Through the actions of its employees and agents, Exelon acted intentionally, maliciously, oppressively, and with willful, callous, wanted and reckless disregard for Mr. Sims' rights and with deliberate indifference to the protected rights of Mr. Sims.  Mr. Sims experienced extreme mental anguish and financial loss.

WHEREFORE, Mr. Sims demands judgment against Exelon and seeks the following relief:

A.   Back pay and front pay;

B.   Liquidated damages;

C.   Attorneys' fees and costs;

D.   Injunctive relief;

E.   Pre and Post-Judgment interest.

F.   Attorney fees and costs; and

G.   Such other relief as the nature of his causes may permit.

## DEMAND FOR TRIAL BY JURY

Mr. Sims demands a trial by jury in this action on all causes in this Lawsuit.

Respectfully Submitted,

_____/s/_____
Ruth Ann Azeredo  (No. 16175)
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD  21401
(410) 558-1915
(410) 558-1917 Fax
ruthazeredo@comcast.net
*Counsel for Plaintiff*

-and-

Timothy W. Romberger
Fed. Bar No. 014408
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20046
(202) 248-5053
(703) 582-6494 Cell
timromberger1@comcast.net
*Counsel for Plaintiff*

Date:  April 1, 2020

31